# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ALICE LEONG, | ) |
| | ) No. 11 C 8876 |
| Plaintiff, | ) |
| | ) |
| v. | ) Judge John J. Tharp |
| | ) |
| SAP AMERICA, INC., SAP AG, and | ) |
| ANGELIKA DAMMANN, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Alice Leong filed suit against her former employer, SAP America, Inc., its parent company SAP AG (collectively "SAP"), and Angelika Dammann, SAP's former Chief Human Resources Officer, alleging, among other things, that the defendants discriminated against her on the basis of gender and wrongfully terminated her employment, thereby violating several federal and state statutes. Defendant Dammann moves to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. For the reasons stated below, the motion is denied.

## FACTS

Defendant Dammann is a German citizen. Cmplt ¶ 7. From July 2010 to August 2011 she served as the Chief Human Resources Officer of SAP AG, a German corporation with its principal office located in Walldorf, Germany, and SAP America, Inc., a Delaware corporation with its principal place of business in Pennsylvania. *Id.* In her capacity as Chief Human Resources Officer of SAP, Dammann worked out of SAP's corporate headquarters in Germany, but she served as the head of human resources for all of SAP's employees worldwide, including those like Leong who were located in Illinois.

1

Cmplt. ¶ 15. She never traveled to Illinois while employed by SAP. Dammann Decl. (Dkt. 23-1) ¶ 7. She has set foot in Illinois only one time, several years ago, when her flight was unexpectedly diverted to O'Hare International Airport. Dammann Decl. (Dkt. 23-1) ¶ 7.

Leong, who served as SAP's Head of Global Diversity, alleges that she and other female employees were undercompensated in violation of the Equal Pay Act and other statutes during her tenure at SAP. In 2006 SAP promoted Leong to Vice President, but she alleges that she was paid less than the male employees at her level. Cmplt. ¶¶ 54-56. SAP later promoted Leong to Global Vice President in January 2010, but she alleges that her pay grade was not properly increased to account for her promotion. *Id.* ¶ 42. In July 2010, Dammann became Leong's direct supervisor. The parties agree that in the fall of 2010 Leong complained to Dammann about SAP's failure to increase her pay grade, and that after an investigation, Dammann affirmed the company's prior refusal to increase Leong's pay grade. Dammann Decl. (Dkt. 23-1) ¶ 13; Dkt. 41 at 5.

In November 2010, Roger Bellis took over as Leong's direct supervisor. Dammann Decl. (Dkt. 23-1) ¶ 11. In early 2011, Bellis needed to provide a performance review for Leong. Cmplt. ¶ 64. Because he had served as her supervisor for only a few months, he asked Dammann to provide feedback regarding Leong's performance, which Dammann did. *Id.* ¶ 70; Dammann Decl. (Dkt. 23-1) ¶ 12. Dammann recommended that Bellis give Leong SAP's lowest possible rating: "does not fully meet expectations." Cmplt. ¶ 71. After receiving Dammann's recommendation, Bellis gave Leong a performance review with SAP's second-lowest rating, that she "partially met expectations" for 2010. *Id.* ¶ 64. Because of her poor performance review, SAP gave

Leong a bonus for 2010 substantially lower than any bonus it had previously given in her tenure as Head of Global Diversity. Dkt. 41 at 5-6.

After receiving the negative performance review, on February 18, 2011, Leong contacted Dammann and asked for a transition package "to facilitate [her] re-entry into the job market and help [her] land on [her] feet." Dkt. 41-11 at 2; Leong Dep. (Dkt. 57-1) at 164-65. On March 16, 2011, Leong participated on a conference call with Dammann, Bellis, and another SAP employee named Laura Thiel to discuss her performance review and her future at SAP. Cmplt. ¶ 85; Dammann Decl. (Dkt. 23-1) ¶14; Leong Dep. (Dkt. 57-1) at 189-90. During the call, Bellis and Thiel offered Leong a severance package. Leong Dep. (Dkt. 57-1) at 194. Leong alleges that after that conference call, Thiel contacted her and terminated her employment. Cmplt. ¶ 85. Reading Leong's claims broadly and drawing every reasonable inference in her favor,[1] she conceivably alleges that Dammann made, or participated in, the decision to fire her. Dkt. 41 at 5; Cmplt. ¶ 133. Dammann, however, refuted that allegation in her declaration, stating that she "did not make or participate in any decision to terminate Ms. Leong's employment." Dammann Decl. (Dkt. 23-1) ¶ 14. Leong did not address that contention in her own declaration. Leong Decl. (Dkt. 41-1).

## DISCUSSION

When a defendant moves to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), the plaintiff bears the burden of proving that personal jurisdiction exists.

---

[1] In deciding a Rule 12(b)(2) motion to dismiss, the Court should "read the complaint liberally with every inference drawn in favor of the plaintiff and resolve all factual disputes in favor of plaintiff." *GCIU-Employer Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1020 n. 1 (7th Cir. 2009). However, the Court will accept as true facts contained in the defendant's affidavit that are not refuted by the plaintiff in a counter-affidavit. *Id.*

*RAR, Inc. v. Turner Diesel Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997). The plaintiff must make a prima facie case for personal jurisdiction over the defendant. *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). To determine whether the plaintiff has met her burden, the Court may consider affidavits from both parties. *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012). The Court must accept the plaintiff's uncontroverted allegations as true. *Id.*; *GCIU-Employer Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1020 n. 1 (7th Cir. 2009). However, when the defendant challenges by declaration a fact alleged in the plaintiff's complaint, the plaintiff has an obligation to go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 783 (7th Cir. 2003). While in this context affidavits trump the pleadings, in the end all facts disputed in the affidavits will be resolved in the plaintiff's favor. *Id.* at 782.

The parties agree that Dammann provided Bellis (at his request) with negative feedback regarding Leong's performance and participated on a conference call with Leong regarding her performance evaluation on the same day that Leong was terminated. While Leong attempts to lay responsibility for the termination decision on Dammann's doorstep, the Court must conclude, on the strength of Dammann's uncontroverted declaration, that she played no role in the decision to fire Leong. Indeed, Leong admitted in her deposition, Dkt. 57-1 at 164-65, that she had already submitted a request for a transition package to facilitate her re-entry into the workforce from SAP, a fact that suggests that the die had been cast before the conference call ever took place.

Dammann also asserts that she "did not make any decision to assign a job or grade, or set compensation for, [Leong's] position." Dkt. 57 at 3; Dammann Decl. (Dkt.

23-1) ¶ 13. Dammann's own declaration, however, belies that contention. Dammann acknowledges that she "confirmed [her] predecessor's decision regarding Ms. Leong's job grade and compensation," Dammann Decl. (Dkt. 23-1) ¶ 13, effectively conceding that she did "make [a] decision" about Leong's compensation—she decided to leave it unchanged after Leong asked that it be increased. Nothing in Dammann's declaration supports the characterization of this action in her motion as merely an administrative function; rather, her declaration states plainly that, in response to Leong's complaint concerning her pay grade, Dammann (i) instructed subordinates to look into the issue; (ii) reviewed their investigation and recommendation; and (iii) decided that no change to Dammann's pay grade should be made. Dammann has therefore effectively conceded that she made a decision not to increase Leong's pay grade while she was Leong's direct supervisor.

In a federal question case where federal statutes do not authorize nationwide service of process, as here, the federal court has personal jurisdiction only if a court of the state in which the federal court sits would have jurisdiction. *uBID, Inc. v. GoDaddy Group, Inc.*, 623 F.3d 421, 425 (7th Cir. 2010). A court's exercise of personal jurisdiction may be limited by the applicable state statute or the federal Constitution. *Sommese v. American Bank and Trust Co.*, No. 11 C 2827, 2012 WL 3006824, *2 (N.D. Ill. July 23, 2012). The Illinois "long-arm statute has been held to be coextensive with the due process requirements of the Illinois and United States Constitutions," and therefore the two-step inquiry collapses into one—whether the exercise of personal jurisdiction over the defendants comports with constitutional due process. *Wiggen v. Wiggen*, 2011 IL App (2d) 100982 ¶ 21, 954 N.E.2d 432, 437 (2d Dist. 2011). The Court must determine

whether Dammann has sufficient "minimum contacts" with Illinois such that the maintenance of the suit "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). Stated differently, "each defendant must have purposely established minimum contacts with the forum state such that he or she 'should reasonably anticipate being haled into court' there." *Tamburo v. Dworkin*, 601 F.3d 693, 701 (7th Cir. 2010) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)).

"Minimum contacts" sufficient to satisfy due process can be based on facts establishing either general or specific jurisdiction over the defendant. Plaintiff does not argue (and the Court would not in any event conclude) that she has offered facts sufficient to establish general jurisdiction over Dammann,[2] so the inquiry in this case is limited to whether the facts suffice to establish specific jurisdiction over Dammann. Specific personal jurisdiction is established where three essential elements are met: "(1) the defendant must have purposely availed himself of the privilege of conducting business in the forum state or purposefully directed his activities at the state; (2) the alleged injury must have arisen from the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice." *Felland*, 682 F.3d at 673 (internal citations omitted).

The constitutional touchstone in the due process analysis is whether the defendant "purposely established minimum contacts in the forum state." *Id*. By most any measure,

---

[2] "A defendant with 'continuous and systematic' contacts with a state is subject to general jurisdiction there in any action." *Tamburo*, 601 F.3d at 701. The threshold to establish general jurisdiction is high. A party must have contacts with the forum that are "sufficiently extensive and pervasive to approximate physical presence," and "isolated or sporadic contacts—such as occasional visits to the forum state—are insufficient." *Id.*

Dammann has had little to do with Illinois. As she points out, she "has never worked, lived, owned property or even set foot in the State of Illinois for any reason other than an unexpected airplane transfer at O'Hare airport many years ago." Dkt. 23 at 1. And Leong concedes that she had "little direct contact" with Dammann while both worked for SAP. Cmplt. ¶ 72. Should Dammann nevertheless reasonably anticipate being haled into a court in Illinois on the basis of a handful of communications and decisions regarding a single Illinois employee?

Yes. Although Dammann did not physically travel to Illinois, she made decisions regarding Leong's compensation and employment which she knew would affect Leong's job in Illinois. Personal jurisdiction does not turn on physical presence; more significant is whether a putative defendant's actions were knowingly and intentionally directed towards Illinois. *Tamburo v. Dworkin*, 601 F.3d 693, 706 (7th Cir. 2010) ("[A]lthough they acted from points outside the forum state, these defendants specifically aimed their tortious conduct at [the plaintiff] and his business in Illinois with the knowledge that he lived, worked, and would suffer the 'brunt of the injury' there."); *Farmer v. DirectSat USA, LLC*, No. 08-3962, 2010 WL 380697, *9 (N.D. Ill. Jan 28, 2010) (accepting personal jurisdiction over out-of-state corporate officers who implemented allegedly unlawful wage and hour policies). Dammann was physically located in Germany when she acted, but Leong was allegedly injured in Illinois, and "an individual injured in Illinois need not go to [Germany] . . . to seek redress from persons who knowingly cause injuries in Illinois." *Powell v. XO Servs., Inc.*, 781 F.Supp.2d 706, 716 (N.D. Ill. 2011); *see also Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assoc. of Houston Metroplex, P.A.*, 623 F.3d 440, 444 (7th Cir. 2010) ("Specific personal jurisdiction is

appropriate when the defendant purposefully directs its activities at the forum state and the alleged injury arises out of those activities.").

Even beyond causing injury in Illinois, Dammann also sent communications to the forum—telephoning Leong in Illinois to discuss her compensation and participating in a teleconference with Leong in Illinois regarding her performance—which establishes that she knew her actions would affect an Illinois resident. This further strengthens the case for personal jurisdiction. *See Cuff v. Trans States Holdings, Inc.*, No. 10 C 1349, 2010 WL 2698299, *4 (July 8, 2010) (termination letter sent to Illinois employee was "knowingly and intentionally directed towards Illinois" where employer knew that "any wrong done to the Plaintiff would be felt at least in part in Illinois"); *Rice v. Nova Biomedical Corp.*, 763 F. Supp. 961, 965-66 (N.D. Ill. 1991) (defendant subject to Illinois jurisdiction because he terminated Illinois employee by telephoning him in Illinois).

Dammann cites several cases where personal jurisdiction was lacking, but those cases are distinguishable and do not alter this analysis. In *Lane v. Lucent Tech., Inc.*, 388 F. Supp. 2d 590, 594-95 (M.D.N.C. 2005), for instance, the defendant only *responded* to the plaintiff's complaints of discrimination. There was no allegation that the defendant affirmatively discriminated against the plaintiff or directed any action whatsoever at the forum state. *Id.* Similarly, *Williams v. D. Richey Mgmt. Corp.*, No. 87 C 6398, 1988 WL 8983, *2 (N.D. Ill. Jan 28, 1988) involved defendants whose Illinois actions did not "give rise to any of [the plaintiff's] causes of action," whereas Dammann's refusal to adjust Leong's pay directly gives rise to Leong's Equal Pay Act claim. Finally, Dammann cites to *Murphy v. PriceWaterhouseCoopers, LLP*, 357 F. Supp. 2d 230, 243 (D.D.C. 2004),

where the plaintiff did not allege that the defendants "specifically made decisions" regarding the plaintiffs or had any "direct contact" with the plaintiffs. Dammann's situation is easily distinguishable—Leong alleges both that Dammann made a decision not to correct her salary and that Dammann was in direct contact with her about that issue. And whether or not Dammann actually made the decisions about Leong's salary and employment, she admits that she communicated with Leong and others about both issues. The aggregate contacts arising from her involvement is sufficient to establish jurisdiction even if Dammann did not personally make the final decisions.

Dammann argues that even if personal jurisdiction would otherwise exist, the "fiduciary shield doctrine" would negate jurisdiction because Dammann acted only in her corporate capacity, not in her personal capacity. Illinois recognizes a fiduciary shield that "denies personal jurisdiction over an individual whose presence and activity in the state in which the suit is brought were solely on behalf of his employer or other principal." *Rice*, 38 F.3d at 912. The Illinois Supreme Court has explained that where an individual defendant's conduct "was a product of, and was motivated by, his employment situation and not his personal interests . . . it would be unfair to use this conduct to assert personal jurisdiction over him as an individual." *United Fin. Mortg. v. Bayshores Funding Corp.*, 245 F. Supp. 2d 884, 894 (N.D. Ill. 2002) (citing *Rollins v. Ellwood*, 141 Ill.2d 244, 280, 565 N.E.2d 1302, 1318 (1990)). Application of the doctrine is discretionary, however, so even if its criteria are satisfied, it does not bar the exercise of personal jurisdiction by Illinois courts. *Rice*, 38 F.3d at 914. In addition, there are two exceptions to the fiduciary shield doctrine: "(1) the shield is removed if the individual's personal interests motivated his actions, and (2) the shield generally does not apply when the individual's actions are

9

discretionary." *Zurich Capital Markets, Inc. v. Coglianese*, 388 F. Supp. 2d 847, 860 (N.D. Ill. 2004) (internal citations omitted). Leong does not dispute that Dammann acted on behalf of SAP, but she argues that both exceptions to the fiduciary shield doctrine apply, and therefore that the doctrine is inapplicable here. Dkt. 41 at 10.

With regard to the first exception, Leong argues that Dammann was a "high-ranking company officer[] with a direct financial stake in the company's financial success" because she received incentive compensation and virtual stock options. *Id.* But owning a small amount of a corporation's stock does not disqualify a defendant from the protection of the fiduciary shield doctrine. *Compare Glass v. Kemper Corp.*, 930 F. Supp. 332, 340-42 (N.D. Ill. 1996) (applying fiduciary shield doctrine though defendant owned a small amount of his employer's stock), *with Brujis v. Shaw*, 876 F. Supp. 975, 980 (N.D. Ill. 1995) (declining to apply fiduciary shield doctrine to defendant who owned a vast majority of the corporation's shares). Leong has not established (nor even alleged) that Dammann's actions were taken for her own personal benefit, fiduciary or otherwise. In fact, Leong's allegations suggest that Dammann acted solely on behalf of SAP. Because there is no hint that Dammann's actions towards Leong stemmed from any personal interest, the first exception to the fiduciary shield doctrine does not apply.

As to the second exception, Leong alleges that as SAP's Chief Human Resources Officer, Dammann had control and discretion over Leong's compensation, the conditions of her employment, and SAP's response to Leong's complaints of unequal pay. Dkt. 41 at 9-10. Dammann does not deny that she had discretion over these issues.[3] "[C]ourts do not

---

[3] Through her declaration, Dammann denies actually making any decision to set Leong's compensation, though she admits to "confirm[ing] [her] predecessor's decision regarding Ms. Leong's job grade and compensation." Dammann Decl. (Dkt. 23-1) ¶¶ 13-14. But

consider it unfair to exercise jurisdiction over an individual when the actions giving rise to personal jurisdiction are discretionary." *Sommese*, 2012 WL 3006824 at *5 (citing *Brujis*, 876 F. Supp. at 978). Even where an employee is "essentially compelled . . . to follow company policies in making hiring, firing, and compensation decisions," the fiduciary shield does not protect discretionary decisions. *Id.*; *see also Farmer*, 2010 WL 380697 at *3-4 (holding that officers including the director of human resources who had the authority to hire and fire employees and the authority to make compensation decisions were not entitled to the protections of the fiduciary shield doctrine). Therefore, because Leong has made a prima facie showing that Dammann had discretion over her allegedly unlawful actions, the fiduciary shield doctrine does not apply.

At this stage, based on the facts in the pleadings and declarations that are undisputed, the Court concludes that Leong has carried her burden of establishing personal jurisdiction over Dammann. The Court's ruling is without prejudice, however; if, for example, discovery reveals that Dammann's involvement was entirely at the discretion of her employer and that she was merely following SAP's policies and not exercising her own discretion in her interactions with Leong,[4] then Dammann may once again move for dismissal on jurisdiction grounds. But for now, Leong has met her burden, and the Court has personal jurisdiction over Dammann.

---

this denial does not relate to Dammann's *discretion* regarding compensation and termination. Implicit in her statement that she confirmed the prior decision regarding Leong's pay grade is an acknowledgement that she had the discretion to modify that prior decision.

[4] Dammann has not even argued that she lacked discretion. Rather, she has argued only that she acted "for her employer's benefit, not her own." Dkt. 23 at 1.

Date: October 3, 2012

John J. Tharp, Jr.
United States District Judge