**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ALICE LEONG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 11 C 08876 |
| v. | ) | |
| | ) | Judge John J. Tharp, Jr. |
| SAP AMERICA, INC., SAP AG, and | ) | |
| ANGELIKA DAMMANN, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In this employment-discrimination case, Plaintiff Alice Leong alleges that her former employer, defendant SAP, underpaid her relative to male employees because she is a woman. She therefore claims discrimination based on sex under Title VII of the Civil Rights Act, 42 U.S.C.A. § 2000e *et seq*., as well as unequal pay and retaliation under the federal[1] and Illinois[2] equal-pay statutes, and, finally, breach of contract. SAP moves for summary judgment, and for the reasons that follow, the motion is granted.

---

[1] 29 U.S.C. § 206(d)(1), a subsection of the federal minimum wage law, provides:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

[2] 820 ILCS 112/1 *et seq*.

# FACTS

Headquartered in Germany, SAP AG is "a world leader in enterprise applications in terms of software and software-related service revenue." Compl. ¶ 8. SAP America ("SAP"), plaintiff Leong's former employer,[3] is the subsidiary that oversees the company's operations in the United States. For purposes of this opinion, the SAP defendants will be referred to collectively as "SAP" unless more specific identification is otherwise required. The third defendant, to whom Leong's retaliation claim is directed, is Angelika Dammann, Chief Human Resources Officer and Labor Relations Director of SAP AG, who from July 2010 to November 2010 was Leong's direct supervisor.

Plaintiff Alice Leong—formerly Alice Conlin—began working for SAP in 1997 as a Segment Manager for SAP's Consumer Products Industry Center of Expertise, and she continued working for SAP until March 16, 2011. In 2006, Leong applied for, and was hired for, a promotion to a human resources position that would come to be known as Vice President, Global Diversity. The functions of this position were not new, but the consolidation of those functions and responsibilities in a dedicated position was new within SAP's human resources department. Before this promotion, Leong had no human resources experience and had never taken any classes related to human resources or diversity other than internal training.

On September 21, 2006, Leong received an email from David Kaput, Senior Vice President of Global HR Practices and Governance, her direct supervisor in the new position, "to confirm the key position/promotion details we discussed." Leong Dep. Ex. 8, Dkt. # 91-1 at 65. The email set forth, among other things, the job title, reporting structure, salary, target bonus,

---

[3] Leong has not established that she was an employee of SAP AG, and admits that she was employed by SAP America. Pl. Rule 56.1 Response para 11. That said, SAP AG does not argue that it is entitled to summary judgment on the basis of this distinction.

benefits, and review process. The annual base salary was $126,500 with a target bonus of $63,250.[4] The "review" section stated that Leong would receive a normal performance and compensation review at year-end 2006 and "special mid-year 2007 review (in Jul 2007) of perf/comp with potential mid-year base salary adjustment." The email also confirmed that Leong would "continue to be an 'at-will' employee."

On November 1, the effective date of the promotion, Leong signed a "Confirmation of Promotion" which is described therein as "an offer" for the Grade Level I position of Global Diversity Vice President. The offer refers to the salary increase to $5,270.83 semi-monthly (*i.e.,* $126,500 annually), "subject to business performance and company policy relative to promotional increases." Leong signed the "acceptance" portion of the document, which stated: "I accept this promotion offer and acknowledge the terms above as well as the fact that this offer does not constitute a contract of employment and my SAP employment remains 'at-will.'"

Before the compensation for Leong's new position had been finalized, Kaput had recommended a higher base salary for the job. A compensation consultant, Emily Simolike, did a compensation analysis and determined that "external benchmark data for the position indicated that the base salary in the 50th percentile was $185,000 and the 60th percentile was $208,000." She ultimately recommended a base salary of $150,000 with total target compensation of $250,000 with bonus. Kaput, in turn, recommended a base salary of $140,000 with a target bonus

---

[4] Compensation grade I "was for executive employees of SAP America functioning at the Vice President level." Answer, Dkt. # 9 at ¶ 25. From 2006 to 2010, SAP America maintained confidential salary charts that provided minimum, midpoint, and maximum salary figures for various pay grade levels. These take into account both internal and external benchmark data about comparable positions. Under SAP policy, an employee in executive grade level I also would be eligible for a target bonus equal to 50% of her base salary; the actual bonus was calculated according a formula that accounted for, among other things, the employee's performance, the performance of the employee's department, and the performance of SAP overall.

of $70,000. He forwarded the recommendation to Joerg Staff, then a Human Resources Business Partner working under Claus Heinrich, the Chief Human Resources Officer. Kaput noted that the proposed salary was "significantly below the market and SAP benchmarks." Thiele Dec. Ex. A, Dkt. # 91-4 at 7. Staff rejected the recommended compensation. Specifically, Staff wrote that he "could not support" the $140,000 salary for Leong because "from the start the overall promotions increase should not be higher that 10%—better less." Thiele Dec. Ex. A, Dkt. # 91-4 at 7. Leong's salary before her promotion was $114,843. Kaput then reduced the starting salary to $126,500 (a 10 percent increase, if rounded to the nearest $500) and obtained Staff's approval.

Thus, in 2006, the year of her promotion, Leong's base salary was $126,500, and her target bonus was $63,250. This annual base salary was below what was listed as the grade level I minimum for 2006. Leong received a bonus for calendar year 2006 that was 118.5% of her target. Leong did not receive an increase in her base salary or target bonus for 2007, nor did she receive a salary or performance review at mid-year 2007. Her 2007 bonus was 115% of target, and in 2008, her annual base salary increased to $135,987.50, and her target bonus increased to $67,993.75. The 2008 base salary was still below the grade level I minimum. Leong's 2008 bonus was 121% of her target; she did not receive an increase in her base salary or target bonus for 2009. Leong's 2009 bonus was 186% of her target, and for 2010 she received a salary increase to $148,226 and increase in her target bonus to $74,133. This salary increase placed her above the minimum for grade I.

According to Frank Reing, the Vice President of "Total Awards" for SAP America, who is responsible for the compensation program, two factors might contribute to an employee being paid below the salary range for the grade level assigned to his or her position: (1) the individual's level of "skills and experience"; (2) the "scope and reach" of the job compared to others. Reing

Dep. 65-66, Dkt. # 91-2 at 5. According to Reing, there is no guideline or practice at SAP about where an employee is placed with a pay grade range when they are newly hired or promoted: "[i]t depends on the person." Moreover, according to Reing, the "minimum" salary is "not a floor."

During Leong's tenure as vice president for global diversity, SAP bestowed salary increases on various other HR directors and managers that constituted raises in excess of 10%. Frank Reing received increases of 10.6%, 14.3%, and 14.9% (in addition to other raises) between 2006 and 2011. Mark Steinke, who held various HR recruiting positions, received salary increases of 13.8% (less than a year after a 7.4% increase), 12.2%, 13.5% and 13.4% between 2005 and 2008. Claudio Vespucci, a human resources director, received salary increases of 10.9% and 20.1% between 2007 and 2011.

In February 2010, Leong became the "Global Vice President, Global Diversity."[5] She received an email from Stefan Reis that states, as to "a change in your position title and salary," that "your new base salary is 148,226 USD (a raise of about 17.1 percent) and your target bonus percentage is 50%....The title of your position is Global VP and the grade level is I." Thus, Leong continued in her grade I compensation level and was not placed in Grade II, which was generally the grade assigned to "global vice presidents." Reing was not aware of any person within SAP allowed to use the title of Global Vice President—a term used only in the United States—who was paid at grade level I.

At several points in 2010, Leong raised the issue of the appropriateness of her salary with various individuals within SAP. She inquired about being paid below the minimum for her grade and not being paid on the global VP scale, grade level II. She was told that she was "on target" in

---

[5] As we will see, the parties disagree about whether Leong received a promotion or just a title change.

her current grade level classification. In particular, on July 15, 2010, Laura Thiele, an executive in SAP America's human resources department, stated that there might be "confusion with the use of the global title, yet not aligning [Leong] to the global VP grade of II." Thiele explained: "Your role is not at the II level. In hindsight, perhaps we should not have enabled you to use the global HR VP title on your signature line if this created the perception that you were being promoted to global VP role." Later in 2010, Leong continued to send emails—including to Frank Reing and to Baerbel Ostertag, the human resources "business partner" for Leong—about her compensation. In a November 2010 email to Ostertag, Reing confirmed that Leong's compensation should not be changed at that time. Leong never complained to Ries, Staff, Ostertag, Thiele, or Dammann that there was discrepancy in her pay due to her gender.

As of December 31, 2006—roughly the time of Leong's promotion to vice president—there were ten SAP America employees in a human resources role who were paid in grade level I. Leong is the only one whose salary was below the minimum of the salary range. One woman's salary was higher than the maximum; one woman and one man were paid in the top half of the range; one woman and one man were at the midpoint; and three women and one man were paid in the lower half of the range.[6] In the next three years, it continued to be the case that only Leong was paid below the minimum range, among that same cohort. The remaining employees, men and women, were paid along all points within or above the range. As of 2010, Leong's salary was within the range (in the bottom half); no human resources employees in grade level I were paid below the range.

---

[6] Leong's objection to the admission of this evidence as hearsay and lacking in foundation are overruled. Frank Reing's testimony and documentation support the statements; Reing has ample basis for personal knowledge as (at the time of his deposition) Vice President of Total Rewards and the individual responsible for designing the compensation, benefits, and recognitions programs applicable to all employees in North America.

Throughout her tenure as a vice president, Leong reported to several different supervisors. In late 2006, Joerg Staff succeed Kaput as head of Human Resources Global Practices and Governance, becoming Leong's manager. Shortly thereafter, that division was reorganized and renamed, but Staff remained Leong's supervisor. In July 2009, another reorganization occurred and Leong was reassigned to a working group led by Stefan Reis, the Global Head of Human Resources, who became Leong's supervisor. From July 2010 to November 2010, Leong's supervisor was Angelika Dammann, then the Chief Human Resources Officer and Labor Relations Director of SAP AG. In November 2010, Leong's immediate supervisor changed once again, when she began reporting to Roger Bellis.

In February 2011, Bellis's performance review for Leong reflected that she "partially meets expectations"—the second-lowest rating available. This was in contrast to prior performance reviews in which Leong's overall rating had been "exceeds expectations" or better. Bellis had supervised Leong for only about four months and had minimal face-to-face contact with Leong before evaluating her performance, and he had minimal knowledge of the programs that Leong had developed and implemented. Bellis did not personally meet with Leong to discuss the goals and objectives that had been set for her by her previous supervisor at her last annual review. In reviewing Leong, Bellis had requested feedback about Leong's performance from defendant Dammann, who had not evaluated Leong during the period that she reported to Dammann. (Bellis did not consult Reiss, Leong's other supervisor in 2010.) Dammann provided Bellis with a written assessment of Leoong's performance and recommended that Leong be given a rating of "does not fully meet expectations," which is the lowest possible rating. Neither Dammann nor Bellis had communicated to Leong that she was not meeting her 2010 goals before her performance review in February 2011. Dammann's assessment of Leong's

performance weighed significantly in Bellis's evaluation of Leong. Because Dammann was not Leong's supervisor, her assessment was not posted in SAP's employee performance review data base, and Leong was not given a copy when she requested it; it was, however, read to her verbatim during her performance review. Leong "formally rejected" her 2010 performance review according to SAP procedure, but her 2010 bonus was affected by the negative review and was just 86% of target.

On February 18, 2011, Leong emailed Dammann to respond to Dammann's assessment of her performance, as conveyed by Bellis. Leong disputed Dammann's characterization of her performance as well as the process by which the performance evaluation had been conducted. Leong Dep. Ex. 22, Dkt. # 91-1 at 106. As a result of what she perceived to be an unfair process and unjustified rating, Leong concluded: "my employment at SAP is no longer valued and that the relationship is beyond repair." *Id.* She went on to "request fair treatment to facilitate my re-entry into the job markert." *Id.* Then she raised the "separate point" of her compensation, setting forth her position that she had been "underpaid during [her] entire tenure in this role." She laid out her compensation and stated that "[a] male holding a Vice President or Global Vice President position at these grade levels would have been earning an income within these grade level parameters." She requested a "thorough investigation" of the discrepancy. She also requested that her performance rating for 2010 be changed, and that she receive the same fair "separation package" that other employees had received. At the time she sent this email, no one at SAP had asked Leong to leave the company.

This email led to a telephone conference call among Dammann, Bellis, Leong, and Laura Thiele, another human resources executive, on March 16, 2011. Thiele's email summary of the call the next day, which Leong acknowledged, stated that during the call, SAP had "reluctantly"

accepted Leong's resignation effective March 16. Leong had already emailed other SAP employees announcing that she was leaving the company.

Leong filed an administrative charge of discrimination against SAP on May 24, 2011. After receiving her right-to-sue notice, Leong timely filed this lawsuit on December 14, 2011. At the close of discovery, the defendants moved for summary judgment.

## DISCUSSION

Summary judgment should be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding the motion, the Court examines the record in the light most favorable to the non-moving party, resolving all evidentiary conflicts in her favor and according her the benefit of all reasonable inferences that may be drawn from the record. *Coleman v. Donahoe*, 667, F.3d 835, 842 (7th Cir. 2012). It is relevant to the Court's analysis in this case, though not ultimately to the outcome, "that the non-moving party does not bear the burden of *proving* [her] case; the opponent of summary judgment need only point to evidence that can be put in an admissible form at trial, and that, if believed by the fact-finder, could support judgment in [her] favor." *Marr v. Bank of America, N.A*., 662 F.3d 963, 966 (7th Cir. 2011).

### A.    Discrimination Based on Sex

Leong claims that SAP underpaid her because of her sex, but SAP argues that Leong lacks factual support for her claim. Leong invokes the indirect method of proof, which requires her to establish that: (1) she is a member of a protected class; (2) she reasonably performed to SAP's legitimate job expectations; (3) she suffered a materially adverse employment action; and (4) SAP treated her differently than a similarly situated employee outside her protected class. *Maclin v. SBC Ameritech*, 520 F.3d 781, 787 (7th Cir. 2008); *see McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 802 (1973). If she makes out this prima facie case, the burden shifts to SAP to come forth with a legitimate, nondiscriminatory reason for its actions, at which point the plaintiff assumes the burden to show that the proffered justification is pretextual. *Maclin*, 520 F.3d at 792 n.6.

In its opening brief, SAP does not argue that Leong is unable to show any of the required elements of a prima facie case.[7] Instead, with respect to the Title VII claim, SAP makes the following arguments: (1) Leong's initial salary was set according to legitimate non-discriminatory criteria; and (2) SAP's failure to raise Leong to the Grade II pay level in 2010 was not discriminatory because she was not "promoted" at that time.[8] *See* Mem., Dkt. # 92 at 2-6. By not challenging any element of the prima facie case, and jumping directly to its proffered legitimate, non-discriminatory reason for Leong's salary, SAP invites Leong to also focus her arguments on pretext. Yet, SAP criticizes Leong for doing exactly that, contending that because she "skips right past" the prima facie case, the Court should disregard her entire pretext argument and grant summary judgment without further consideration. Reply, Dkt. # 112 at 2, 4.

SAP has it wrong. It is true that a plaintiff cannot skip over the prima facie case and focus on the question of pretext if the defendant raises that argument in its summary-judgment motion.[9] But, although Leong bears the burden of proof with respect to her claims, she is not

---

[7] The heading of section II A, see Mem., Dkt. # 92 at 2, is: "Leong's Salary Was Set According to Legitimate Non-Discriminatory Factors Unrelated to Her Gender And There is No Evidence That Similarly Situated Men Were Treated Differently." The second half of this heading unquestionably invokes one element of the prima facie case, but SAP never again refers to that argument in the opening brief. Perfunctory or undeveloped arguments are waived. *See Bass v. Joliet Public Sch. Dist. No. 86*, 746 F.3d 835, 841 n.1 (7th Cir. 2014).

[8] The defendants further argue that Leong's negative 2010 performance review was not an adverse employment action, but Leong's response clarifies that her Title VII discrimination claim is not based upon the review.

[9] The prima facie case and pretext inquiries often overlap; and the court may skip the analysis of a plaintiff's prima facie case and proceed directly to the evaluation of pretext if the

obligated to respond to arguments that are not made on summary judgment. SAP apparently *intended* to argue that Leong could not identify any similarly-situated male employee who was more favorably treated with respect to pay.[10] That would have been a perfectly legitimate approach. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), made clear that a party may move for summary judgment based on the non-movant's inability to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

But this was not a ground that SAP raised for summary judgment in its opening brief; it made no argument that Leong could not prove one or more elements of the prima facie case. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323. If the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision. *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1182 (7th Cir. 2013); *Sublett v. John Wiley & Sons, Inc*., 463 F.3d 731, 736 (7th Cir. 2006). There is an exception when the plaintiff is on notice that she has to come forward with all of her evidence. *See Cloe*, 712 F.3d at 1182 (cirting *Kellar v. Summit Seating Inc*., 664 F.3d 169, 174 (7th Cir. 2011)). This is not such a case, because it was only in the reply brief that SAP got around to pointing out the supposed evidentiary deficiencies in Leong's prima facie case. Leong easily might have inferred

---

defendant offers a nondiscriminatory explanation for its employment decision. *See Benuzzi v. Bd. of Educ. of City of Chicago*, 647 F.3d 652, 664 (7th Cir. 2011).

[10] SAP belatedly raises this argument for the first time in its reply brief, giving Leong no opportunity to respond. Arguments raised for the first time in reply are waived. *See Kunz v. DeFelice*, 538 F.3d 667 (7th Cir. 2008) (argument not preserved in district court where raised in reply brief for first time).

that SAP was assuming the prima facie case when it immediately came forth with its non-discriminatory justifications for her pay rate, and therefore, her response is not deficient to the extent it focuses on the pretext inquiry. *See Martino v. Wn. & Sn. Financial Group*, 715 F.3d 195, 202 (7th Cir. 2013) ("[W]hen the defendant offers a legitimate, nondiscriminatory reason for the adverse employment action, courts may begin with the pretext inquiry.")..

Accordingly, the Court does not address the belatedly asserted deficiencies in Leong's prima facie case. Rather, it must simply determine whether Leong appropriately responded to SAP's argument that her pay rate was based exclusively on nondiscriminatory factors throughout her tenure as the company's Diversity vice president—in other words, whether she has raised a genuine issue of material fact as to whether the reason was a pretext. In a pay discrimination case, "[t]o demonstrate pretext, [the plaintiff] must show that her employer did not honestly believe in the reasons it gave for setting salaries." *Keeton v. Morningstar, Inc*., 667 F.3d 877, 885 (7th Cir. 2012).

On the summary-judgment record, there is evidence of pretext. SAP highlights evidence to support the claim that Leong's initial salary at promotion was set according to a general policy of limiting raises to 10% of current salary, but to the extent such policy exists, Leong supplies evidence that it is not uniformly or consistently applied. Second, Leong casts doubt on the proposition that the salary ranges maintained by SAP are advisory guidelines rather than formal metrics; therefore, there is the potential for her to give lie to SAP's explanation that paying only Leong below the minimum was a gender-neutral decision.

SAP's primary justification for why Leong's salary was below grade level I for most of her tenure is the supposed policy of capping salary increases for promotions at 10%.[11] Despite evidence that the relevant decisionmakers were aware that Leong's starting salary in the Diversity role was below market and below SAP grade guidelines, they paid her below grade level according to a "policy" that does not appear (so far as SAP has argued) in any of SAP's human resources manuals and policy statements or any document. SAP's primary evidence of a policy is simply the email from Joerge Staff stating, specifically with respect to Leong's promotion, that the salary should not increase more than 10% and "better less." The email alone does not establish a neutral company-wide policy as opposed to a directive about Leong in particular. The other evidence SAP cites is the declaration of Frank Reing, where he states that Leong's initial starting salary at promotion was "consistent with SAP America's practice not to pay increases in excess of 10% of prior salary, even though the result was that Leong's new base salary was set below the minimum of grade level I." To the extent that such a "practice" exists, however, Leong has submitted evidence based on SAP records that the 10% rule was not consistently applied. Salary increases exceeding 10% do not appear to have been uncommon within SAP in Leong's department; SAP does not dispute the evidence Leong highlights to that effect (although SAP does frivolously object to Leong calculating the percentages from the raw

_____

[11] SAP also submits evidence that pay is set at least in part based on individual skills and experience, and that a lack of appropriate skills and experience could be a reason for an employee being paid below the minimum for her grade level. However, SAP has not pointed to any evidence that Leong's skills and experience, or lack thereof, were the basis of the decision in her particular case; SAP points to no testimony from or discussion among the decision-makers to that effect. Rather, the record reflects that a recommended salary for the new position was developed based on benchmarks for comparable positions inside and outside SAP, and that the recommended salary based on these objective factors was reduced for Leong to cap her pay increase at 10%.

data). If the "practice" is invoked only sporadically, a jury reasonably could conclude that the 10% cap was a pretext for discrimination in Leong's case.

SAP's proffered reason for not moving Leong to grade level II when she became "Global Vice President" is that she was not "promoted" and that her role was not at the level of a "global vice president"—just her title. But Leong calls this into question with the mere fact that she was expressly bestowed with the title of "Global Vice President" and simultaneously given a salary increase, albeit not one that placed her in grade level II, the dedicated category for "global vice presidents." SAP maintains that Leong was not "promoted" but merely allowed to use the title, but a jury could conclude otherwise. It is not as though SAP has, as yet, explained *why* Leong's role was not equal to that of a "real" global vice president; it has merely pronounced that to be true. SAP has not discussed the training, qualifications, experience, and job responsibilities of the employees in grade level II as compared to Leong. It is not for this Court to question the wisdom of employers' decisions—here, giving an employee a title with a defined meaning inapplicable to that employee's role and with a corresponding pay scale for which that employee is ineligible—but there is a basis to question the plausibility of the explanation, so a jury might conclude that SAP's action was "something worse than a business error—a lie or deceit designed to cover one's tracks." *Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 435 (7th Cir. 2005).

Even so, Leong is not in the clear. Pretext is a two-part inquiry. The Seventh Circuit has stated in no uncertain terms: "Our recent Title VII cases explain that a plaintiff demonstrates pretext by showing the employer's proffered nondiscriminatory reason is a lie *and the real reason is based on discriminatory intent*." *Hobbs v. City of Chicago*, 573 F.3d 454, 461-62 (7th Cit. 2009) (emphasis added) (collecting cases and affirming summary judgment where plaintiff failed to prove either pretext or discriminatory animus); *see also Benuzzi*, 647 F.3d at 663 ("To

show pretext, [the plaintiff] must show not only that the [employer's] stated reasons . . . were dishonest or phony, but also that the true reason was based on prohibited discriminatory animus"); *Stockwell v. City of Harvey,* 597 F.3d 895, 901 (7th Cir. 2010) ("plaintiff also must provide evidence that supports the inference that the real reason was discriminatory"). In *Benuzzi*, for example, the Seventh Circuit affirmed the district court's grant of summary judgment for the employer, explaining that even if the employer's accounts of the disciplinary incidents giving rise to the plaintiff's termination had been cut "from whole cloth," the plaintiff's claim still failed because "nothing in the record … so much as hints that she did so because of [plaintiff's] gender." 647 F.3d at 663-64.

So too here. Leong has not so much as attempted to make an adequate showing that there is a genuine issue of material fact that SAP's actions were taken on account of her gender. The evidence of record establishes only that SAP pays its male and female employees all over the map (including paying female employees above the "maximum" for their pay grades). She marshals no evidence of discriminatory comments, discriminatory policies, or circumstantial evidence of any kind that might point to gender discrimination as a possible motivating factor for her salary. *See, e.g., Hobbs*, 573 F.3d at 463-63; *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006). Certainly she does not attempt to demonstrate that any particular individual responsible for setting her compensation had a discriminatory motive. Leong might think that the discrimination is self-evident because she is a woman, assuming she was indeed underpaid for her level, but she cannot simply rest on these facts to support an inference of discriminatory animus. As in *Benuzzi*, there is nothing in the record that so much as hints that any decisions about Leong's compensation were made because of her gender. *See* 647 F.3d at 663-64. Even if those decisions were not made for the reasons the company has proffered, they could have been

made for other reasons that the company is reluctant to acknowledge but which are nevertheless not unlawful. *See, e.g., Hobbs*, 573 F.3d at 463 (suggesting that promotion of unqualified individual over plaintiff could have been motivated by "favoritism" rather than gender or race discrimination).

Thus, even though, SAP did not timely challenge Leong's ability to prove a prima facie case, and even though the sincerity of SAP's explanations for paying Leong less than its own guidelines prescribe is subject to question, summary judgment is granted on the Title VII claim because there is not a shred of evidence in the record from which it could be inferred that Leong's gender was a motivating factor in setting her compensation.

### B. Violation of Equal Pay Act

The burdens under the federal Equal Pay Act differ from those under Title VII. The plaintiff does not need to show any discriminatory intent on the part of the employer. *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 922 (7th Cir. 2000) (The Equal Pay Act "(unlike Title VII) does not require intent to discriminate."); *Stopka v. Alliance of Am. Insurers*, 141 F.3d 681, 685 (7th Cir. 1998). The plaintiff does not have to make a prima facie case of discrimination, just of unequal pay. *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 822 (7th Cir. 2011). By virtue of the statute, an employee's "only burden is to show a difference in pay for 'equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *King v. Acosta Sales and Marketing, Inc.*, 678 F.3d 470, 474 (7th Cir. 2012) (quoting § 206(d)(1)). If the employer then contends that any difference is explained by something other than sex, it must prove that the explanatory variable *actually* accounts for the difference; it is an affirmative defense as to which the defendant bears the burdens of production and persuasion. *Id.* (citing *Corning Glass Works v. Brennan*, 417 U.S.

188, 204 (1974)). Under the Equal Pay Act, it is not up to the plaintiff to establish that the employer's neutral reasoning is pretextual; the employer must prove its reasons outright once the plaintiff has shown a prima facie case of pay disparity.

Here, the defendant argues both that the plaintiff shows no disparity—because she is not comparing equal jobs—and that purely neutral factors explain Leong's compensation package. The latter defense fails because, as discussed with respect to Leong's pretext argument, SAP has not proved as a matter of law that neutral policies fully explain Leong's salary; both the existence of those policies and whether they were consistently applied can reasonably be questioned on the current record.

Therefore, the equal-pay claim turns on whether Leong has demonstrated a genuine issue of material fact as to whether she was paid less than male employees for comparable work. To establish a prima facie case under the EPA, she must produce sufficient evidence from which a jury could conclude that (1) higher wages were paid to a male employee, (2) that the wages were for equal work requiring substantially similar skill, effort and responsibilities, and (3) that the work was performed under similar working conditions. *Merillat*, 470 F.3d at 695. To show that her diversity portfolio entailed "equal skill, equal effort, and equal responsibility" with the portfolios of the employees to whom she compares herself, Leong must demonstrate each of these factors separately. *See Stopka*, 141 F.3d at 686 (citing EEOC regulation 29 C.F.R. § 1620.14(a) and explaining that the equal "skill, effort, and responsibility" tests each must be independently satisfied for the equal-pay standard to apply). The Seventh Circuit has noted that under the EPA, there is a "stringent statutory requirement of equality." *Randall*, 637 F.3d at 822.

Leong fails the comparability tests. First, Leong fails to set forth the primary responsibilities and functions of her job and the skills and experience required to perform them.

(Indeed, in her brief, the plaintiff fails to complete the sentence that might do so, writing: "Plaintiff's common core tasks are as follows: [blank space]." Mem., Dkt. # 104 at 10.)

Second, as a comparator, Leong points solely to Mark Steinke, an "HR infrastructure manager" whose job responsibilities (as summarized by the plaintiff, *see* Mem., Dkt. # 104 at 10) "combine[] recruiting and HR process and system's [sic] capabilities with people management, change management, and communication skills to develop strategies for driving continuous operation efficiencies into SAP's global recruiting and staffing organization" and who must also "manage relationships with key stakeholders in HR operations as well as the HR business partner and center of excellence functions to align global recruiting processes with SAP business objectives: manage relationship with program owners and stakeholders inside and outside of a chart to understand and determine business priorities"; and who further "[i]dentified integration synergies and issues between established and/ or propose[d] processes and how they relate both internal and extra system; represent the staffing business needs for prioritization through annual planning and budgeting, and work closely with the HR operations leadership team to make recommendations and prioritization decisions that impact how SAP runs."

Presumably, this impenetrable stream of corporate jargon corresponds to some actual tasks and requires some specialized knowledge or skill, but Leong has chosen not to translate it for the lay person, nor does she describe in plain terms what her own job entailed. Rather than describe her own job and compare it to Steinke's to support her argument that they are "identical," Leong simply argues that it is up to a jury to review the job descriptions and decide. Mem., Dkt. # 104 at 11 ("It is clear from the job descriptions for Steinke he [sic] and the plaintiff ... are comparators, but ultimately it is up to the jury to decide whether or not that is a fact."). But it is her burden at summary judgment (when the defendant has adequately challenged her ability

to do so, and as to this claim the defendant did so) to make out a prima facie case of unequal pay, and this requires her to provide the details about her comparators: "who these employees were, what their duties were, when they started work, where they worked, and what their backgrounds were." *See Goodman v. National Sec. Agency, Inc*., 621 F.3d 651, 657 (7th Cir. 2010) (further explaining that the district court was under no obligation to parse the plaintiff's "woefully inadequate showing").

And third, to the extent Leong engages in any comparison, the similarities that Leong identifies are ones are based on considerations such as job title, description, and pay range, which are not supposed to factor into the determination of whether positions are "substantially equal." It is the actual content of the job that matters, and Leong has not met her burden in that respect. *Stopka,*141 F.3d at 686 n.5 (explaining that the jobs' real content must be evaluated, not job titles, classifications, or descriptions). Leong also ignores undisputed differences between her Steinke, such as the disparate number of their direct reports, and also fails to offer any evidence that Steinke had similar experience, training, or seniority.

Leong has not shown that in her particular case her job entailed substantially equal skill, effort, and responsibility to Steinke's job, or that of anyone else who received higher pay. She therefore fails to make out a prima facie case of unequal pay, and summary judgment is proper for SAP as to that theory of relief.

**C.    Retaliation**

Leong also contends that Angelika Dammann (the only defendant as to this claim) illegally retaliated against her for complaining about her pay by contributing negative feedback about Leong for the 2010 performance evaluation prepared by Roger Bellis, being inappropriately hostile to Leong, and ignoring Leong's work product. To establish a prima facie

case for unlawful retaliation under the Equal Pay Act, a plaintiff must prove three elements: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was a causal link between the protected expression and the adverse action. *Culver v. Gorman & Co*., 416 F.3d 540, 545 (7th Cir. 2005).

The protected expression that Leong says led to the retaliation is an "oral complaint" she made, to someone other than Dammann, that Dammann "learned about," Dkt. # 104 at 13, but Leong does not identify the specific incident to which she purports to refer. Based on the summary judgment record, however, it is clear that the first time Leong complained about *gender-based* pay discrepancies was in her Feburary 2011 email to Dammann; before that, she had simply attempted to have her annual base salary increased and, later, to be placed into grade level II once given the title "Global Vice President." The Equal Pay Act, like Title VII, protects against discrimination in pay "*on the basis of sex*." 29 U.S.C. 206(d).  A complaint about dissatisfaction with one's compensation in general does not trigger protection of the statute. This requirement is dispositive here, because all of Dammann's allegedly retaliatory actions took place *before* the February 2011 email raising the issue of gender-based pay disparities for the first time. The plaintiff's theory fails if the allegedly retaliatory conduct precedes the statutorily protected activity. *Leitgen v. Franciscan Skemp Healthcare, Inc*., 630 F.3d 668 (7th Cir. 2011). The only conduct Leong points to that came after her statutorily protected email to Dammann is Dammann "yelling" at her during the conference call leading to her separation from SAP. Even assuming that the yelling occurred, Leong has not attempted to support her implication that this was a materially adverse employment action that could itself support a retaliation claim. *See Goodman*, 621 F.3d at 655 (no adverse employment action where plaintiff's pay and benefits did not change and action did not affect job responsibilities).

Leong also fails to establish any causal connection between her protected activity (assuming the February 2011 email to be the protected activity, since it is the only complaint about gender-based discrimination in the record) and any materially adverse employment action by Dammann. She does not contend that her separation from SAP—which the record fairly clearly establishes was a voluntary resignation by Leong that was not welcomed by Leong's superiors—was retaliatory; nor could she, as Dammann was not her supervisor or otherwise in position to terminate Leong's employment. She points to no other materially adverse action taken after her complaint of unequal pay based on gender that could be causally connected to the complaint. She therefore has not raised a genuine issue of material fact as to the retaliation claim.

### D.      Breach of Contract

Leong's breach of contract claim, which is premised on the email she received from Kaput "confirming" the details of her promotion (Exhibit B to the complaint), is easily disposed of. She maintains that the email is an enforceable contract that is ambiguous as to the salary term, but which was breached by SAP by "failing to pay the Plaintiff within the appropriate grade, failing to provide the special mid-year review in July 2007, underpaying the Plaintiff in the amount of $453,931." Compl. ¶ 112.

Leong's breach of contract claim cannot get out of the starting gate because it is undisputed that she was an "at will" employee. Generally, an at will employment agreement "can be modified by an employer as a condition of its continuance." *Wyatt v. Dishong,* 469 N.E.2d 608, 611, 127 Ill. App. 3d 716, 720 (Ill. App. Ct. 1984) (noting that "a contract terminable at the will of either party can be modified at any time by either party as a condition to its continuance"); *Wignes v. AON Corporation Excess Benefit Plan,* No. 08 C 5047, 2010 WL 1193756, *4 (N.D. Ill. 2010). The right to unilaterally modify at-will employment terms includes

the right to modify compensation terms. *Geary v. Telular Corp.,* 93 N.E.2d 128, 131, 341 Ill. App. 3d 694, 698 (Ill. App. Ct. 2003).

Because Leong was an at will employee, SAP had the right to modify the terms of her employment going forward regardless of what terms it may have agreed to in October 2006. Leong's claim that the company "breached" a promise to pay her within a particular range, or to review her performance after six months is therefore a non-starter; the company had no obligation to do so (and she had no obligation to continue working for SAP).

Even taken on its own terms, moreover, the plaintiff's breach of contract claim fails. Leong does not bother to support her argument that all elements for contract formation are satisfied by the Kaput email, *see, e.g.*, Restatement 2d of Contracts § 17 (June 2014), and the Court doubts it is. There is nothing in the email that suggests that it was an "offer" of contractual terms; the October 26, 2006, email by its plain terms was a unilateral "confirmation" of predetermined details about the new position. On the other hand, Leong manifested her "acceptance" of the "offer" promotion in a subsequent "Confirmation of Promotion" dated November 1. That document states the terms of compensation but nothing about a "special mid-year review." It further requires Leong's acknowledgment that there is no "contract of employment" and that she remains an at-will employee.

Even if the email were a contract, the first and third of the alleged "breaches" (failing to pay Leong within the appropriate grade and underpaying her throughout her tenure) are belied by the factual record at summary judgment; there is no question that Plaintiff was paid the annual base salary and bonus that are stated in the email, so it provides no basis for a claim that she was paid less than the agreed-upon amount. Moreover, the plaintiff nowhere disputes that she was a grade-I level employee from the time of her promotion on; for example, her 50% bonus target is

a product of her grade I pay category. Indeed, the plaintiff's very claim that she was underpaid *depends* on her agreement that she was in grade I; her pay is low by reference to the salary range for that grade. So Leong cannot claim that the email "contract" was breached because she was not put in the proper pay grade; to the extent that her pay was not within the range for that grade, there is no promise anywhere in the email that it would be. She was promised a salary figure that SAP made good on.

There remains (having put to the side for the sake of argument the at-will nature of her employment) the question whether the email was a contractually enforceable promise to give Leong a "special mid-year 2007 review (in July 2007) of perf/comp with potential mid-year base salary adjustment," and whether, as Leong contends, failing to provide the review breached a contract and violated the implied duty of good faith and fair dealing. Mem., Dkt. # 104 at 15. Even assuming, *arguendo*, that the email constituted a promise to reevaluate Leong's salary in good faith in six months, Leong cannot establish any damage resulting from the failure to provide a review of her performance and compensation and to "potential[ly] . . . adjust[]" her salary after six months. Even if the promise of a review were enforceable, there was no promise to increase her salary; only the "potential" for a salary increase (or decrease) is noted. This is too indefinite a promise, and any resulting damage is too speculative to support a claim. *See Haslund v. Simon Property Group, Inc.*, 378 F.3d 653, 658 (7th Cir. 2004). And reasoned speculation does not suggest that a review would have led to a salary increase into the nominal Grade I range; for Leong, that did not occur until the beginning of 2010, after multiple annual reviews; there is no basis to believe that she would have gotten there any sooner had she been reviewed six months in. As for the implied duty of good faith and fair dealing, it is unclear what the argument adds to Leong's claims of breach, which are meritless. And Leong already has

failed as a matter of law to establish that her pay was the product of discrimination, or even unequal, so it is unclear what other bad faith she might be alleging.

Finally, Leong insists that only a jury can interpret the email because there is an ambiguity on its face—that is, that the stated base salary was not within the range for the stated grade level. (See Mem., Dkt. # 104 at 15). But the other impediments preclude any fact issue for a jury to decide. The breach-of-contract claim must fail.

* * *

Leong fails to raise a genuine issue of material fact with respect to her claims of pay discrimination claim under Title VII and the Equal Pay Act, retaliation, and breach of contract. Therefore, SAP's motion for summary judgment is granted.

Date: September 17, 2014

_____
John J. Tharp, Jr.
United States District Judge